Juan Carlos MORENO et al., Plaintiffs,

v.

John S. TOLL, President, University of Maryland, Defendant.

Civ. A. No. M–75–691.

United States District Court,
D. Maryland.

Oct. 31, 1979.

Alfred L. Scanlan, James R. Bieke, John Townsend Rich, Raymond M. Bernstein, and Shea & Gardner, Washington, D. C., for plaintiffs.

Stephen H. Sachs, Atty. Gen., David H. Feldman, Asst. Atty. Gen., Chief of Litigation, and Robert A. Zarnoch, Asst. Atty. Gen., Baltimore, Md., for defendant.

**MEMORANDUM**

JAMES R. MILLER, Jr., District Judge.

## I. Statement of Facts

This case was initially filed as a class action by three named plaintiffs, Juan Carlos Moreno, Juan Pablo Otero, and Clare B. Hogg seeking declaratory and injunctive relief against the University of Maryland and Dr. Wilson H. Elkins, then president of the University. The plaintiffs sought relief for themselves and for others similarly situated from the University of Maryland's "In-State Policy" which prohibited non-immigrant aliens from establishing in-state student status at the University. The plaintiffs claimed that this policy was invalid in that it created a constitutionally impermissible irrebuttable presumption which denied them due process of the law, and that it violated the Equal Protection Clause of the Constitution.

The policy in question was adopted by the Board of Regents of the University of Maryland, effective January 1, 1974. This policy creates two classes of students, "in-state" and "out-of-state", for purposes of considerations for admissions, tuition rates, and charge differentials. The relevant provisions of the policy are as follows:

"General Policy"

"1. It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes to United States citizens, and to *immigrant aliens lawfully admitted for permanent residence in accordance with the laws of the United States*, in the following cases:

"a. Where a student is financially dependent upon a parent, parents, or spouse domiciled in Maryland for at least six consecutive months prior to the last day available for registration for the forthcoming semester.

"b. Where a student is financially independent for at least the preceding twelve months, and provided the student has maintained his domicile in Maryland for at least six consecutive months immediately prior to the last day available for

registration for the forthcoming semester. (Emphasis added).

\* \* \* \* \* \*

"2. It is the policy of the University of Maryland to attribute out-of-state status for admission, tuition, and charge differential purposes in all other cases.

\* \* \* \* \* \*

*"Definitions"*

"1. A student is financially dependent if he receives half or more than half of his support from another person or persons, or appears as a dependent on the federal or state income tax return of any other person. Conversely, a student is financially independent if he declares himself so, if he receives less than half of his support from any other person or persons and if he does not appear as a dependent on the federal or state income tax return of any other person.

"4. A domicile is a person's permanent place of abode; namely, there must be demonstrated an intention to live permanently or indefinitely in Maryland. For purposes of this policy only one domicile may be maintained at a given time . ."

There are eight criteria which the University takes into consideration in determining whether Maryland domicile has been established by the relevant person. These criteria are whether the individual:

a. Owns or rents and occupies real property in Maryland as his (her) domicile on a year-round basis.

b. Maintains a substantially uninterrupted presence within Maryland for six consecutive months, including those months when the University is not in regular session.

c. Maintains within the State of Maryland all or substantially all personal possessions.

d. Pays Maryland income tax on all earned income including taxable income earned outside the State.

e. Registers all owned motor vehicles in Maryland.

f. Possesses a valid Maryland driver's license, if licensed.

g. Registers to vote in Maryland, if registered.

h. Gives a Maryland home address on federal and state income tax forms.

In the present case, the three named plaintiffs were students at the University of Maryland, College Park Campus. Each was financially dependent upon a parent who was in the country on a G–4 visa.[1] In each case the University determined that these plaintiffs were not entitled to "instate" status. This ruling was initially predicated upon the University's belief that holders of G–4 visas were incapable of forming the requisite intent to become Maryland domiciliaries. All three plaintiffs unsuccessfully challenged this ruling through the University's appellate process in an attempt to show that they were, in

---

1. 8 U.S.C. § 1101(a)(15)(A) through (L) provides the definitions of the various classifications of nonimmigrant aliens. Subsection (G), applicable in this case, provides as follows:

(G)(i) a designated principal resident representative of a foreign government recognized de jure by the United States, which foreign government is a member of an international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (59 Stat. 669) accredited resident members of the staff of such representatives, and members of his or their immediate family;

(ii) other accredited representatives of such a foreign government to such international organizations, and the members of their immediate families;

(iii) an alien able to qualify under (i) or (ii) above except for the fact that the government of which such alien is an accredited representative is not recognized de jure by the United States, or that the government of which he is an accredited representative is not a member of such international organization; and the members of his immediate family;

(iv) officers, or employees of such international organizations, and the members of their immediate families;

(v) attendants, servants, and personal employees of any such representative, officer, or employee, and the members of the immediate families of such attendants, servants, and personal employees;

fact, Maryland domiciliaries.[2] The plaintiffs then filed suit in this court.

## II. History of the Case

On July 13, 1976, this court filed an opinion in this case following a hearing on motions by both parties for summary judgment. *Moreno v. University of Maryland,* 420 F.Supp. 541 (D.Md.1976). At that time the defendant University of Maryland was dismissed from this action since it was held not to be a "person" within the meaning of 42 U.S.C. § 1983. This court also granted plaintiffs' motion to certify this matter as a class action. The court then held:

"That the 'In-State Policy' of the University of Maryland which denies to G–4 aliens by the use of an irrebuttable presumption of non-domicile the opportunity to establish 'in-state' status is unconstitutional as it is in violation of the Due Process Clause of the Fourteenth Amendment, and (6) [t]hat defendant Dr. Wilson H. Elkins is hereby enjoined from enforcing the University of Maryland's 'In-State Policy' with respect to the named plaintiffs and the members of their class by denying them the opportunity to demonstrate that they or any of them are entitled to 'in-state' status for purposes of tuition and charge differential determinations." Id. at 565.[3]

Defendant appealed and the Court of Appeals for the Fourth Circuit affirmed the district court decision 556 F.2d 573 (4th Cir. 1977). The Supreme Court granted certiorari 434 U.S. 888, 98 S.Ct. 260, 54 L.Ed.2d 173 (1977), to consider whether this decision conflicted with the decision in *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

The Supreme Court, in addressing this case, initially held that "the federal constitutional issues in this case cannot be resolved without deciding an important issue of Maryland law." It therefore certified the question of state law to the Maryland Court of Appeals. *Elkins v. Moreno,* 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978).

In its consideration of the case, the Supreme Court concluded that "the gravamen of [the] dispute is unquestionably whether, as a matter of federal and Maryland law, G–4 aliens can form the intent necessary to allow them to become domiciliaries of Maryland [since the] University has consistently maintained throughout this litigation that, notwithstanding other possible inter-

---

**2.** The pertinent facts regarding these plaintiffs are as follows:

Plaintiff Moreno's parents are both citizens of Paraguay and holders of G–4 visas, as Moreno had worked for the Inter-American Development Bank for 14 years as of the time this suit was filed. The Morenos have owned a home in Maryland since 1963; both parents are licensed to drive in this State and their vehicle is registered here. Plaintiff Moreno is also licensed to drive in Maryland. Plaintiff Moreno filed tax returns in both the United States and Maryland in 1973 and 1974.

Plaintiff Otero's father is a citizen of Bolivia, also in the country on a G–4 visa and working in the Inter-American Development Bank; Mrs. Otero is a United States citizen. The Oteros moved to Maryland and have owned a home here since 1965.

Both the Oteros and their son are licensed to drive in Maryland; their vehicle is registered in Maryland. Plaintiff Otero filed both United States and Maryland tax returns in 1972, 1973 and 1974. Plaintiff Otero applied to have his visa status changed to that of an immigrant.

Plaintiff Hogg's parents are citizens of the United Kingdom and holders of G–4 visas. Mr. Hogg has been employed by the International Bank since 1962. The Hoggs moved to Maryland in 1970 and own a home in the state. The Hoggs and their daughter are licensed to drive in Maryland, and their vehicle is registered there. The Hoggs paid taxes to both the United States and Maryland on income other than Mr. Hogg's salary. Plaintiff Hogg also filed tax returns in 1973 and 1974.

All three families have paid state and local retail taxes, real estate taxes, vehicle, fuel, excise and other taxes. The plaintiffs' complaint states an intent, both on the part of the plaintiffs and their families, to remain in Maryland indefinitely.

**3.** It should be noted that these provisions of the court's original order were stayed, pending appeal, on condition that, in the event the appeal was unsuccessful, the University agreed to refund the difference between "out-of-state" and "in-state" charges assessed to eligible students with G–4 visas enrolled in the University in the semester commencing in the Fall of 1976 or any semester thereafter.

pretations of its policy statement, its 'paramount' and controlling concern is with domicile as defined by the courts of Maryland." *Id.* at 658–659, 98 S.Ct. at 1345.[4] Accordingly the Court found this case to be "squarely within *Vlandis*[5] as limited by *Salfi*[6] to those situations in which a State 'purport[s] to be concerned with [domicile, but] at the same time den[ies] to one seeking to meet its test of [domicile] the opportunity to show factors clearly bearing on that issue.'" *Id.* at 660, 98 S.Ct. at 1346, quoting *Weinberger v. Salfi,* 422 U.S. at 771, 95 S.Ct. 2457. The Court found it unnecessary to review the *Vlandis* rationale, given the posture of the case.[7] Accordingly, the Court certified the following question to the Maryland Court of Appeals:

"Are persons residing in Maryland who hold or are named in a visa under 8 U.S.C. § 1101(a)(15)(G)(iv) (1976 ed.), or who are financially dependent upon a person holding or named in such a visa, incapable as a matter of state law of becoming domiciliaries of Maryland?" *Id.* 435 U.S. at 668–669, 98 S.Ct. at 1351.

The Supreme Court upheld the conclusion of this court, as a matter of federal law, that G–4 aliens are not precluded from acquiring domicile in their state of residence. *Id.* at 665–667, 98 S.Ct. 1338.

Mr. Justice Rehnquist, joined by Chief Justice Burger, filed a dissent in this action based on his conclusion that the due process issue could be decided without resolving the question of Maryland domicile law. The dissent contended that domicile was not the sole criterion looked upon by the University in this case.[8] Rather, domicile and other factors, including cost equalization, were reasons for the University's determination that nonimmigrant aliens should not be accorded the benefits given under the in-state policy to citizens and immigrant aliens domiciled in the state. Accordingly, the dissent maintained that this case does not fall squarely within the decision in *Vlandis v. Kline.*[9] *Id.* at 675, 98 S.Ct. 1338. The dissent maintained that the constitutional issues are controlled by *Weinberger v. Salfi, supra* at note 5, and accordingly concluded that the state law question need not be certified in order to resolve the due process issues presented.

Following the Supreme Court decision, the Court of Appeals of Maryland addressed the certified question of whether or not G–4 aliens are precluded by state law from acquiring domicile in Maryland. *Toll v. Moreno,* 284 Md. 425, 397 A.2d 1009 (1979). The court held that nothing in the general

**4.** See *Elkins v. Moreno,* 435 U.S. 647 at 659 n. 8, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978) for the Supreme Court's summary of the defendant's insistence that this case is governed by the Maryland law of domicile.

**5.** *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 39 L.Ed.2d 63 (1973).

**6.** *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

**7.** The Court found no necessity to review the Constitutional principles since the issue could apparently be avoided given either a positive or negative response by the Maryland Court of Appeals. If a G–4 alien were found to be incapable of obtaining domicile in Maryland, then any "irrebuttable presumption" would be universally true and therefore would present no constitutional issue. If, however, G–4 aliens were found to be capable of acquiring domicile in Maryland the Court found that the University "apparently ha[d] no interest in continuing to deny in-state status to G–4 aliens as a class if they can become Maryland domiciliaries since it ha[d] indicated both [there] and [here]

that it would redraft its policy 'to accommodate' G–4 aliens were the Maryland courts to hold that G–4 aliens [could] have the requisite intent." *Elkins v. Moreno,* 435 U.S. at 661, 98 S.Ct. at 1347.

**8.** The dissent contended that, under the applicable University policy, the criteria initially examined are whether the student is either a "United States citizen" or an "immigrant alien lawfully admitted for permanent residence." If the student satisfied these initial criteria, the University then addressed the question of domicile. *Elkins v. Moreno,* 435 U.S. at 670, 98 S.Ct. at 1351.

**9.** *Vlandis v. Kline* held that where a State "purport[s] to be concerned with residency, it might not at the same time deny to one seeking to meet its test of residency the opportunity to show factors clearly bearing on that issue." *Weinberger v. Salfi,* 422 U.S. at 771, 95 S.Ct. at 2470 (citing *Vlandis v. Kline,* 412 U.S. at 452, 93 S.Ct. 2230).

Maryland law of domicile renders G–4 visa holders, or their dependents, incapable of becoming domiciled in Maryland. The court, however, noted that the defendants' posture in presenting this question had altered significantly since the Supreme Court's decision in this case. The Court of Appeals referred to this as an apparent attempt by the defendants to adopt the dissent's contention that the Maryland law of domicile is not determinative of this case, despite prior assertions to the contrary. Consistent with the defendants' altered view, the Board of Regents of the University passed a resolution on June 23, 1978 declaring in part that:

"The Board of Regents deems its statutory authority under the laws of Maryland to include the power, right, or privilege to adopt a more restrictive definition of domicile for purposes of according in-state status for admissions, tuitions, and charge differentials than may be applicable generally or otherwise under the Maryland common law."

The Court of Appeals did not address this contention, as it was beyond the scope of the question certified for its consideration. *Id.* at 434, 397 A.2d 1013.

Following the decision in the Court of Appeals, the defendants attempted to restore this case to the active docket of the Supreme Court. The Supreme Court initially took note of the June 23, 1978 statement of the Board of Regents of the University of Maryland entitled "A Resolution Clarifying the Purposes, Meaning, and Application of the Policy of the University of Maryland for Determination of In-State Status for Admissions, Tuition, and Charge-Differential Purposes, insofar as It Denies In-State Status to Nonimmigrant Aliens."[10] This statement, purporting to reaffirm the University's policy regardless of whether or not it conforms with the Maryland law of domicile, runs counter to the Supreme Court's original premise that the University would re-draft its policy to accommodate G–4 aliens were the Maryland courts to hold them capable of acquiring domicile.[11] Upon noting this, the Supreme Court held that if domicile is not the "paramount" policy consideration, then this case no longer falls squarely within *Vlandis* as limited by *Salfi*,[12] and accordingly the new constitutional issues raised by the clarifying resolution should be considered in the first instance by this court. *Toll v. Moreno*, 441 U.S. 458, 99 S.Ct. 2044, 60 L.Ed.2d 354. Thus the case is before this court on remand from the Supreme Court for "consideration in light of [the] opinion and judgment in *Elkins*, the opinion and judgment of the Maryland Court of Appeals in *Toll*, and The Board of Regent's Clarifying Resolution of June 23, 1978."

10. The full text of the statement provides as follows:

"Purposes and Interests of In-State Policy. The Board of Regents finds and declares that the policy approved on September 21, 1973, insofar as it denies in-state status to nonimmigrant aliens, serves a number of substantial purposes and interests, whether or not it conforms to the generally or otherwise applicable definition of domicile under the Maryland common law, including but not limited to:

"(a) limiting the University's expenditures by granting a higher subsidy toward the expenses of providing educational services to that class of persons who, as a class, are more likely to have a close affinity to the State and to contribute more to its economic well-being;

"(b) achieving equalization between the affected classes of the expense of providing educational services;

"(c) efficiently administering the University's in-state determination and appeals process; and

"(d) preventing disparate treatment among categories of nonimmigrants with respect to admissions, tuition, and charge-differentials.

"Reaffirmation of In-State Policy. Regardless of whether or not the policy approved by the Board of Regents on September 21, 1973, conforms with the generally or otherwise applicable definition of domicile under the Maryland, common law, the Board of Regents reaffirms that policy because it intends and deems it to serve a number of substantial purposes and interests, including but not limited to those set forth above."

11. See, *Elkins v. Moreno*, 435 U.S. at 660, 98 S.Ct. 1338.

12. See, notes 6–7, *supra.*

## II. Present Posture of the Case

This action is now before the court for an initial determination of what issues remain to be resolved. Pursuant to the court's request, both parties have filed memoranda outlining their respective positions regarding the effect which the clarifying statement of the Board of Regents has had on this case along with their views regarding the identify of the other issues which remain for the court's decision. After having examined the briefs, the court has concluded that an oral hearing on this matter now before it is not necessary. Local Rule 6.

The plaintiffs initially contend that the following three issues still remain in this case:

> 1. Whether the University's in-state policy violates the Equal Protection Clause of the Constitution;
> 2. Whether the policy still creates an unlawful irrebuttable presumption as construed by *Vlandis v. Kline*; and
> 3. Whether the policy violates the Supremacy Clause of the Constitution.

The University's response details its position that the issue of cost equalization, as highlighted by the Board of Regent's clarifying resolution, is not new to this case but has been advanced by the defendants throughout the history of this litigation. The defendants contend that the Supreme Court decision in *Moreno v. Toll, supra,* has effectively removed the irrebuttable presumption issue from this case.

The plaintiffs' response is that the defendants' position throughout this litigation, up to the point of certification to the Court of Appeals, was that the Maryland law of domicile was the controlling question in this case. Plaintiffs maintain that the cost equalization arguments raised in the course of this litigation were presented as a rationalization of interests served by the policy. The plaintiffs further maintain that the irrebuttable presumption issue has not been removed from the case by the Supreme Court's decision but rather its continued viability is one of the issues remanded for this court's consideration.

## A. The Irrebuttable Presumption Issue

### 1. The Effect of the Supreme Court's Rulings

The first issue which this court must address is that of whether or not the second Supreme Court opinion removed the irrebuttable presumption issue from this case. Counsel have filed radically different readings of the relevant portions of the Supreme Court opinion, with plaintiffs' counsel maintaining that this issue remains viable and defendants' counsel contending that the "law of the case" is that this issue has been removed from the case.

In my judgment, the correct interpretation of the Court's second decision can only be obtained by reading it in conjunction with the Court's earlier opinion in *Elkins v. Moreno,* 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978). The Court clearly premised its treatment in the earlier case on two factors: "Because petitioner makes domicile the 'paramount' policy consideration and because respondents' contention is that they can be domiciled in Maryland but are conclusively presumed to be unable to do so, this case is squarely within *Vlandis* as limited by *Salfi* . . ." *Id.* at 660, 98 S.Ct. at 1346. The Court based this treatment on its finding that "the gravamen of [the] dispute is unquestionably whether, as a matter of federal and Maryland law, G–4 aliens can form the intent necessary to allow them to become domiciliaries of Maryland. [Since the] University has consistently maintained throughout this litigation that, notwithstanding other possible interpretations of its policy statement, its 'paramount' and controlling concern is with domicile as defined by the courts of Maryland." *Id.* at 658–659, 98 S.Ct. at 1345.

Subsequent to this Supreme Court decision, the Board of Regents of the University adopted its "clarifying" resolution. This resolution advanced the interest of cost-equalization as a factor in the in-state policy. Further, the resolution reaffirmed the existing policy, irrespective of whether or not it was ultimately found to conform with the Maryland law of domicile. This posi-

tion clearly altered the posture upon which the first Supreme Court decision was premised.

Turning now to the Supreme Court decision, *Toll v. Moreno*, 441 U.S. 458, 99 S.Ct. 2044, 60 L.Ed.2d 354 (1979), we find the court saying:

"... the Board of Regent's Clarifying Resolution has fundamentally altered the posture of the case. [The] decision in *Elkins* rests on the premise that 'the University apparently has no interest in continuing to deny in-state status to G–4 aliens as a class if they can become Maryland domiciliaries since it has indicated both here and in the District Court that it would redraft its policy "to accommodate" G–4 aliens were the Maryland courts to hold that G–4 aliens can' acquire such domicile. [435 U.S. at 661]. After the Clarifying Resolution, this premise no longer appears to be true. And if domicile is not the 'paramount' policy consideration of the University, this case is no longer 'squarely within *Vlandis* as limited by *Salfi* . . . . [Id., at 660, 98 S.Ct. 1338.]'" 99 S.Ct. at 2045–2046.

Read in context, this decision does not "remove the irrebuttable presumption issue from the case entirely." (Defendant's Memo at 11). Rather, the Supreme Court ruling holds that, since the University has indicated it no longer plans to re-draft the in-state policy in response to the decision of the Maryland Court of Appeals to the effect that G–4 aliens can acquire Maryland domicile, it is no longer apparent that domicile is the paramount consideration of this case. If domicile is not the paramount consideration, then this case is no longer governed by *Vlandis* as limited by *Salfi*. The Supreme Court did not conclusively rule on this point; rather it is one of the issues remanded to this court for determination.

### 2. Is Domicile Now the "Paramount" Policy Consideration?

The next question which must be addressed is that of whether or not domicile is the paramount policy consideration in this case. Counsel for both parties have filed detailed memoranda citing instances in the lengthy history of this case in which the defendants, through counsel, discussed the basis of the in-state policy. Plaintiffs' counsel lists various occasions upon which the defendants maintained that domicile was the central issue; defendants' counsel has countered with references to instances in which cost equalization justifications were raised and discussed. This matter cannot be resolved, however, by a comparison of out of context references to statements by the defendants, but rather must be examined in light of the actual policy statement, the clarifying resolution, and the overall case history.

The plain wording of the in-state policy provides that the University will grant in-state status to "United States citizens, and to immigrant aliens . . ." who have been "domiciled" in Maryland, for six months, or, in the case of a dependent student, whose parent or spouse has been domiciled in the state for six months. Thus, as noted by Mr. Justice Rehnquist in his dissent in *Elkins*,[13] and as now advanced by the defendants, the initial hurdle in an in-state status determination is a showing of United States citizenship or immigrant alien status. Absent citizenship or immigrant status, the University does not even reach the question of domicile. The dissent, and now the defendants, contend that what this policy does is to classify nonimmigrant aliens as out of state students for a variety of reasons, one of which is the University's belief that these nonimmigrant aliens lack the capacity to become Maryland domiciliaries. Other reasons would include the rationale of cost equalization. Thus the dissent concludes that there is no irrebuttable presumption based on *domicile* since the initial determination of eligibility for in-state status hinges on a showing of citizenship or immigrant status, and the plaintiffs may present any relevant evidence on that point.

13. *See, Elkins v. Moreno*, supra, 435 U.S. at 669–676, 98 S.Ct. 1338.

Despite the logical appeal of this argument, it is apparent that the overall goal of the University's In-State Policy is to grant admission, tuition, and charge differential benefits to Maryland domiciliaries. The present policy precludes nonimmigrant aliens from consideration for these benefits. The question that must initially be addressed, according to the remand from the Supreme Court in *Toll,* is whether the domicile issue is the "paramount" concern of the University in this case in order to determine whether this policy establishes an irrebuttable presumption precluded by *Vlandis* as limited by *Salfi.*

Despite the defendants' present assertion to the contrary, it is apparent that up until the time of certification of the domicile issue to the Maryland Court of Appeals, the position of the defendants had been that domicile was the chief issue. This posture was noted by the Supreme Court in *Elkins* in stating that the University "makes domicile the 'paramount' policy consideration." On certification to the Court of Appeals, however, the defendants shifted their position. The clarifying resolution plainly states that the University will not change its policy even given an adverse decision on the Maryland law of domicile. Thus, domicile cannot now really be the paramount issue, since the University has now unquestionably stated that it doesn't feel that it is bound by rulings of the Maryland Court on the law of domicile, but rather is free to define domicile in a more restrictive manner if it so chooses. The defendants' position is that domicile, as defined by the applicable Maryland law, is not now the real concern of the in-state policy.

Both parties have devoted considerable attention in their memoranda to the question of whether or not cost equalization has been advanced by the defendants as a consideration in the University's policy. This is not the precise point which needs to be

addressed according to the mandate inherent in the Supreme Court's remand. The question now put before me is whether or not the law of *domicile,* as the term was previously presumed to be defined by the Maryland law of domicile, is the paramount consideration in the University's policy. The clarifying resolution of the University indicates that this is not the position presently taken by the University, in that it now claims the right to construe domicile more narrowly in order to suit its purposes, one of which is cost equalization.

■ Clearly the University is not bound to use the concept of domicile, as defined by state law, in fashioning its tuition policy. The University, through the Board of Regents, is granted broad general powers by the State to administer and manage the operation of the school in such areas as admission, tuition, and fee policies. *Md.Ed. Code Ann.* § 13–104. While this court does not question the University's authority to act in this fashion, I must address the effect of its having done so at this late stage in the litigation.

Although the resolution in question is entitled a "clarifying" resolution, it does not clarify but rather alters the University's position on domicile.[14] Under the resolution the University is no longer concerned with the Maryland law of domicile, but rather with its own more limited use of that term.

### 3. What retroactive effect, if any, should be given the policy change?

■ The initial policy in question was adopted in September, 1973. The ruling by this court was filed on July 13, 1976, granting injunctive relief to the plaintiffs. That order was stayed, however, pending final outcome on appeal on condition that, should the plaintiffs ultimately prevail, the University would refund to them the difference between in-state and out-of-state charges paid.[15]

14. In *Elkins v. Moreno, supra,* at 659, n. 8, 98 S.Ct. 1338, the Supreme Court sets out instances in the history of this case up to that point in which the defendants indicated that the basis of the policy was the law of domicile as established and applied by the Maryland courts.

15. This would still be contingent upon a showing by the individual plaintiff that he or she was, in fact, a domiciliary of Maryland.

The defendants maintain that the plaintiffs' rights have not been adversely affected by the University's change in position and that giving the "clarifying" resolution retroactive effect will not impair the plaintiffs' rights. Defendants base this contention on their perception that the order staying this court's initial injunction order made the plaintiffs' eventual right to any monetary recovery contingent upon a final decision in their favor. Since no final ruling has been entered for the plaintiffs, the defendants claim the plaintiffs have no right to any compensation and will not be prejudiced if the University's regulation is given retroactive effect.

The court is not persuaded by the defendants' argument on this point. Until June 23, 1978, the date of the "clarifying" resolution, the purported concern of the University was with the Maryland law of domicile. Given this premise, the Supreme Court found this case to be squarely within *Vlandis* as limited by *Salfi*. *Elkins v. Moreno, supra,* at 660, 98 S.Ct. 1338. Two matters remained for the Supreme Court's decision at that time:

1. Whether, as found by this court, G–4 aliens could be domiciled in Maryland according to state law; and, if this were possible,

2. Whether the court would further limit or overrule *Vlandis* on the facts of this case.

On certification the Maryland Court of Appeals held that G–4 aliens could acquire domicile in Maryland under the applicable state law. Given the interim change in the defendants' position in this case, however, the Supreme Court did not address the question of overruling or further limiting *Vlandis*. Until the June 1978 policy change, in-state eligibility hinged upon a determination of Maryland domicile according to *state law* principles. The Court of Appeals of Maryland having now determined that G–4 aliens may be domiciled in Maryland according to state law, the plaintiffs were entitled to the benefits of in-state status prior to June 23, 1978, upon a showing that they were, in fact, Maryland domiciliaries,

as that term is generally defined by the laws of the state. The rights of the plaintiffs were asserted and matured under the pre June, 1978 policy. Accepting, as this court must do, that the doctrine of *Vlandis v. Kline, supra,* has not been yet discarded by the Supreme Court, the plaintiffs were denied due process. A change in that policy cannot now retroactively deny plaintiffs the benefits to which they were entitled and which had accrued up to that time. *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Coe v. Secretary of H.E.W.,* 502 F.2d 1337 (4th Cir. 1974).

4. *Is the post June 23, 1978 policy invalid under the Vlandis v. Kline doctrine?*

■ The question which remains is whether the policy, which now purports to be concerned with the University's narrowly construed definition of domicile, still constitutes an impermissible irrebuttable presumption.

In *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), the Court held that a Connecticut statutory definition of "residents" for purpose of fixing tuition at a state university was unconstitutional where the state purported to be concerned with residency yet denied students the opportunity to present facts tending to show they met the test of residency.

In the present posture of this case, the test asserted in the revised In-State Policy is the University's limited definition of domicile, not the generally accepted Maryland law of domicile. The University's definition of the term precludes nonimmigrant aliens from "domiciliary" status. In its present posture, the In-State Policy does not constitute an impermissible irrebuttable presumption. Given the University's definition of domicile, which by its terms excludes nonimmigrant aliens, it is universally true that G–4 aliens cannot qualify for in-state status under that policy. Accordingly, there no longer is an impermissible irrebuttable presumption under the post June 23, 1978 policy.

*B. Other Issues*

The question still remains whether the revised policy violates the Equal Protection and Supremacy Clauses of the Constitution. A conference will be held with counsel to schedule further proceedings on these points.